**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**DANIEL CHU,**
**JEROME KOLLAR, and**
**AMERYN SEIBOLD,**

**Defendants.**

**COMPLAINT**

Case No. 26-cv-7041

**JURY TRIAL DEMANDED**

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission"), for its Complaint against defendants Daniel Chu ("Chu"), Jerome Kollar ("Kollar"), and Ameryn Seibold ("Seibold") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. Between at least 2020 and September 2025, Defendants Chu, Kollar, and Seibold engaged in a fraudulent scheme that caused investors to lose hundreds of millions of dollars through their purchases of asset-backed securities issued by Texas-based car dealer and subprime auto lender Tricolor Holdings, LLC ("Tricolor Holdings"), and its affiliates, Tricolor Auto Group, LLC ("TAG") and Tricolor Auto Acceptance, LLC ("TAA" and, collectively with Tricolor Holdings and TAG, "Tricolor").

2. Through a series of special purpose vehicles ("SPVs"), Tricolor issued nearly two billion dollars of asset-backed securities (or "notes") purportedly collateralized by pools of subprime auto loans ("Tricolor Auto Securitization Trusts" or "TAST ABS Offerings"). Defendants' fraudulent scheme involved misrepresenting auto loan receivables used as collateral to obtain the liquidity necessary to run Tricolor's operations, meet its debt covenants, and prop

up its struggling business. Defendants' fraud included the practice of deliberately double-pledging[1] auto loan receivables to multiple TAST ABS Offerings and to separate non-securitized warehouse lending facilities.

3. For example, Defendants Chu and Kollar falsely told investors (the TAST ABS noteholders) that the loans in the collateral pools were free and clear of other liens and had not been previously pledged to any other party. In fact, with Chu's knowledge and approval, Tricolor, Kollar, and Seibold intentionally included in the TAST ABS Offering collateral pools loans already pledged to other Tricolor lenders and TAST ABS Offerings. Defendants also re-pledged securitized receivables included in TAST ABS Offerings back to warehouse facilities, often almost immediately after the TAST ABS Offerings closed.

4. Chu and Kollar further falsely represented to investors that Tricolor's financial condition was sound when they knew that Tricolor was facing a growing liquidity crisis and edging closer to its eventual collapse.

5. Defendants Kollar and Seibold, at Chu's direction, also included in TAST ABS Offering collateral pools large quantities of ineligible collateral. This included delinquent loans that were more than 30 or 60 days past due, and other loans that should have been "charged off," or removed from the relevant Tricolor collateral base and written off as uncollectible, as required by the securities' offering documents and Tricolor's internal policies. Chu and other Tricolor executives called these uncollectible loans "dead loans" because the borrowers were not making payments—but nonetheless reported them to investors as current and impermissibly counted them in collateral pools.

[1] The terms "double-pledge" and "double-pledging" are used herein to describe collateral that has been pledged to two or more TAST ABS Offerings or loan facilities.

6. By manipulating the securitized collateral in this way, Defendants ensured Tricolor's ultimate collapse. They obligated Tricolor to pay interest and principal on the same loan multiple times, while Tricolor received, at most, only one payment from its customer. Over time, this structure created a hole in Tricolor's collateral base that grew to approximately $800 million and spelled certain doom for Tricolor.

7. In addition, with Chu's knowledge and approval, Kollar and Seibold prepared false monthly servicing reports ("MSRs") for warehouse loans, which concealed the double-pledging, dead loans, and other delinquent loans by altering delinquency status fields, falsifying vehicle identification numbers ("VINs"), and adjusting loan payment terms. Chu and Kollar signed the false MSRs and represented that they were "complete and accurate," knowing that they would be provided to lenders that were also underwriters in the TAST ABS Offerings and at least one lender that also invested in TAST ABS Offerings.

8. From at least early 2020 through September 2025 ("Relevant Period"), Tricolor raised more than $1.9 billion through TAST ABS Offerings, while Tricolor, Chu, and Kollar disseminated materially false statements to investors about Tricolor's financial condition, collateral eligibility, loan delinquency status, and servicing practices. Chu and Kollar received substantial compensation and bonuses tied to, and made possible by, the completion of the TAST ABS Offerings.

9. Certain Tricolor lenders uncovered Defendants' fraud in the summer of 2025 and called Tricolor's debt in early September. Tricolor filed for Chapter 7 bankruptcy on September 10, 2025. Because the bankruptcy proceeding and the associated review of Tricolor's collateral is still ongoing, the full scope of the loss is currently unknown.

10. As of July 31, 2025, shortly before Tricolor filed for bankruptcy, the following TAST ABS Offerings remained outstanding and payable to investors:

| **TAST ABS Offering** | **Month Issued** | **Notes Issued** | **Principal Outstanding (as of Tricolor Bankruptcy)** |
|---|---|---|---|
| 2022-1 | May 2022 | $212,130,000 | $16,996,000 |
| 2023-1 | February 2023 | $223,970,000 | $47,091,000 |
| 2024-1 | January 2024 | $271,320,000 | $109,046,000 |
| 2024-2 | May 2024 | $276,710,000 | $134,018,000 |
| 2024-3 | October 2024 | $287,550,000 | $168,684,000 |
| 2025-1 | March 2025 | $328,100,000 | $264,061,000 |
| 2025-2 | June 2025 | $217,180,000 | $205,500,000 |
| | **TOTAL** | **$1,816,960,000** | **$945,396,000** |

**VIOLATIONS**

11. By virtue of the foregoing conduct and as alleged further herein, Defendant Chu violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)]; and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], or in the alternative, aided and abetted Tricolor's violations of Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5 thereunder, or in the alternative, is liable as a control person of Tricolor under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for violations by Tricolor of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

12. By virtue of the foregoing conduct and as alleged further herein, Defendant Kollar violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)]; and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], or in the alternative, aided and abetted Tricolor's violations of Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5 thereunder.

13. By virtue of the foregoing conduct and as alleged further herein, Defendant Seibold violated Section 17(a)(1) and Section 17(a)(3) of the Securities Act; Section 10(b) of the Exchange Act; and Rule 10b-5(a) and 10b-5(c) thereunder, or, in the alternative, aided and abetted Tricolor's violations of Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5 thereunder.

14. Unless Defendants are restrained and enjoined, they are likely to engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

15. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

16. The Commission seeks a final judgment: (a) permanently restraining and enjoining Defendants Chu, Kollar, and Seibold from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received, directly or indirectly, as a result of the violations alleged in this Complaint and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5),

and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendants Chu and Kollar from serving as officers or directors of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

17. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and 28 U.S.C. § 1331.

18. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

19. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business described in this Complaint occurred within this District, including without limitation:

a. Multiple investors in the TAST ABS Offerings are located in this District.

b. Tricolor, Chu, and Kollar conducted investor meetings and promotional activity in this District, either in person or by phone into the District.

c. Seibold sent MSRs for the TAST ABS Offerings to investors located in this District, via the TAST ABS Offering trustee.

d. Financial Institution A, which has its principal place of business in New York, New York, acted as an underwriter of multiple TAST ABS Offerings.

e. Financial Institution B, which has its principal place of business in New York, New York, acted as an underwriter of multiple TAST ABS Offerings.

f. Defendants have been charged with crimes arising out of the facts of this complaint in this District.

**DEFENDANTS**

20. Chu, age 62, resides in Surfside, Florida. At all relevant times, Chu was the founder, controlling shareholder, Chief Executive Officer ("CEO") and Chairman of Tricolor Holdings, as well as a Manager of Tricolor Holdings, and he exercised actual power and control over Tricolor's operations, the securitization process for the TAST ABS Offerings, and the conduct and performance of Kollar, Seibold, and other Tricolor employees. During the Relevant Period, Chu also served as a member of the Board of Directors of publicly traded Origin Bancorp, Inc. (NYSE: OBK) and its wholly owned subsidiary Origin Bank. Chu resigned from those board positions in September 2025, around the time Tricolor filed for bankruptcy. On December 15, 2025, Chu was indicted in the Southern District of New York based on allegations arising from the facts described herein. On June 24, 2026, the U.S. Attorney's Office for the Southern District of New York filed a superseding indictment against Chu to add, among other things, securities fraud charges.

21. Kollar, age 62, resides in Shady Shores, Texas. Kollar was Tricolor's Chief Financial Officer ("CFO"), Vice President, and Secretary. On or about December 16, 2025,

Kollar entered a guilty plea in the Southern District of New York to charges of bank fraud, wire fraud, securities fraud, and destruction of evidence arising from the facts described herein.

22. Seibold, age 31, resides in Princeton, Texas. Seibold was Tricolor's Senior Director of Finance and Director of Treasury. On or about December 16, 2025, Seibold entered a guilty plea in the Southern District of New York to charges of bank fraud, wire fraud, securities fraud, and destruction of evidence arising from the facts described herein.

## FACTS

### I. ASSET-BACKED SECURITIES

23. In general, a company or sponsor creates an asset-backed security by packaging a pool of assets, such as loans or other receivables, into a bankruptcy remote special purpose entity, typically a trust. The trust then issues securities, known as "asset-backed securities," which are backed by the cash flows generated by the underlying assets. These securities are typically issued in multiple classes or tranches, each with its own priority of payment and risk profile. Purchasers of asset-backed securities are entitled to receive payments based on the performance of underlying assets, according to a predetermined order of priority known as the payment "waterfall." Securitization transactions allow the sponsor to raise capital by monetizing the underlying assets' cash flows, while transferring the credit risk associated with those contracts to the purchasers of the asset-backed securities.[2]

24. In a typical transaction, once the asset-backed securities are issued, the underlying cash flows are collected and distributed according to the waterfall. The waterfall typically prioritizes payments of fees and expenses associated with the securitization, such as servicing

---

[2] By statute, an asset-backed security includes securities collateralized by a pool of loans that allow the holder of the security to receive payments that depend primarily on cash flows from the pool of loans. *See* 15 U.S.C. § 78c(a)(79).

fees and trustee fees, followed by payments of interest and principal to investors in sequential order of priority, beginning with the most senior classes of securities. Many transactions also include a reserve fund—a segregated cash account funded at closing and maintained throughout the life of the transaction that serves as a liquidity cushion available to cover shortfalls in collections. Any residual amounts remaining after the waterfall is satisfied are distributed to the holders of the residual or equity interests. In the case of the Tricolor Auto Securitization Trusts, the waterfall, set forth in the governing documents for each securitization, provided that the investors would receive timely payments of interest and principal, after the payment of fees and expenses associated with the securitization, such as servicing and trustee fees.

## II. BACKGROUND AND TRICOLOR'S SECURITIZATION MODEL

25. Tricolor sold used cars and originated subprime auto loans to borrowers with limited or no credit history. Tricolor's lending business relied on access to capital markets for cash to fund its loan originations and operations. Tricolor primarily obtained this cash by (1) issuing asset-backed securities, and (2) drawing on large warehouse lines of credit secured by auto loan receivables and inventory.

26. Tricolor typically first pledged its auto loan receivables to warehouse lending facilities in exchange for a cash advance. The lending facilities held the receivables for a period of months, and then transferred them into TAST ABS Offering pools upon securitization, at which point Tricolor would receive money from investors in the offering and also pay back a portion of the amount borrowed from its warehouse lenders. Tricolor would then be able to originate new loans, pledge them to one or more warehouse lending facilities, and obtain additional cash. Tricolor's business could not function without continuous access to both sources of funding.

27. Tricolor effected each TAST ABS Offering through an offering memorandum and a series of transaction documents (collectively, "Offering Documents").

28. From 2013 through 2025, Tricolor raised more than $1.9 billion through its issuance of 14 subprime TAST ABS Offerings.

29. Under the terms of the TAST ABS Offerings, as customers made payments on the underlying auto loans, the investors received principal and interest payments and the outstanding principal balance on each note decreased until fully paid off.

30. The Offering Documents also provided that, under certain conditions, Tricolor could choose to pay the outstanding balance on the TAST ABS Offerings early (i.e., prior to their scheduled maturity). At the time of Tricolor's September 2025 bankruptcy, seven TAST ABS Offerings—done from 2022 through 2025—remained at least partially outstanding.[3]

31. Tricolor engaged at least three broker-dealers (Financial Institution A, Financial Institution B, and Financial Institution C) to act as underwriters, managers, bookrunners, and structuring agents for TAST ABS Offerings.

32. In connection with each securitization, TAA sold auto loan receivables to Tricolor Auto Receivables 2 LLC (the "Depositor"), a special purpose entity wholly owned by TAA and established solely to purchase and transfer receivables.

33. The Depositor transferred the auto loan receivables to an issuer entity (e.g., Tricolor Auto Securitization Trust 2025-2) (the "Issuer"), a Delaware statutory trust and bankruptcy-remote SPV created for each TAST ABS Offering.

[3] The TAST ABS Offerings were named sequentially by year and issuance. The seven TAST ABS Offerings that remain at least partially outstanding are: TAST 2022-1, TAST 2023-1, TAST 2024-1, TAST 2024-2, TAST 2024-3, TAST 2025-1, and TAST 2025-2.

34. The Issuer pledged the receivables and related collateral (the "Trust Estate") to an indenture trustee (the "Indenture Trustee"), under the Indenture ("Indenture").

35. The Indenture was a governing contract that created a security interest in the Trust Estate for the benefit of investors, established the priority of payments, and set forth the rights and obligations of the Issuer and the Indenture Trustee.

36. TAA, acting as servicer pursuant to the Sale and Servicing Agreement, collected payments on the auto loan receivables.

37. The Offering Documents contained representations and warranties on receivable eligibility, liens, and servicing practices.

38. Chu signed Offering Documents and SEC Form ABS-15G filings (17 C.F.R. § 249.1400), as required to issue asset-backed securities by Section 15G of the Exchange Act (15 U.S.C. § 78o-11) and the rules promulgated thereunder.

39. The eligibility criteria for collateral included in Offering Documents generally required that each loan receivable:

a. was not encumbered or pledged elsewhere;

b. was not more than 30 days delinquent and had not defaulted;

c. had made at least its first scheduled payment;

d. had an original maturity of not more than 73 months and a remaining maturity of at least 3 months;

e. was not secured by a repossessed vehicle; and

f. was evidenced by an installment sale contract and recorded and assigned title.

40. The Offering Documents also included warranties and covenants by TAA and the Depositor that the receivables and the underlying vehicle collateral were free and clear of any

liens, and that additional new liens would not be created on the vehicles or their associated loan receivables.

41. After each TAST ABS Offering closed, Tricolor furnished the Indenture Trustee and underwriters with monthly MSRs (also referred to as Investor Reports) that detailed the performance of (1) the notes, including payments of principal and interest to investors, and (2) the underlying receivables, including delinquency data, defaults, losses, and recoveries.

42. The MSRs contained officer certifications signed by Chu and Kollar, attesting that the information included in the reports was complete and accurate.

43. Investors received the MSRs from the Indenture Trustee or servicer.

## III. WAREHOUSE LENDING FACILITIES AND LOAN REPORTING

44. Tricolor maintained warehouse facilities with multiple lenders, which were often formed as SPVs.

45. Under Tricolor's warehouse credit agreements, each lender or group of lenders allowed Tricolor to draw down cash against auto loans by pledging loan receivables to the facility.

46. Tricolor could use the cash it obtained from its warehouse facilities for many purposes, including purchasing additional inventory and paying the company's operational expenses.

47. Tricolor's warehouse credit agreements prohibited double-pledging, required first-priority security interests on pledged collateral, imposed eligibility and concentration limits (including loan delinquency thresholds for pledged loans), and required Tricolor to remove ineligible or charged-off loans.

48. To draw on its lending facilities, Tricolor's warehouse credit agreements required it to provide borrowing base reports and MSRs to its lenders. Those reports included extensive data regarding every loan pledged to the facility and applied loan eligibility tests to each loan (e.g., delinquency status, maturity, and remaining payment term) to confirm that the loans were eligible for inclusion in the collateral pool.

49. To maximize the amount of money Tricolor could draw from its lending facilities, Tricolor often provided its lenders with borrowing base reports and funding requests multiple times per week.

50. At month-end, Tricolor delivered detailed MSRs to lenders and the servicer(s), which Chu and Kollar certified to be complete and accurate.

51. Tricolor's warehouse lines of credit were critical to meeting its cashflow needs and funding its operations. During the Relevant Period, Tricolor consistently represented to potential investors in TAST ABS Offerings that it was growing its warehouse lines of credit and had robust capital markets access.

## IV. THE LOAN MANIPULATION AND DOUBLE-PLEDGING SCHEME

52. Beginning in 2020 and continuing through Tricolor's collapse in 2025, Defendants engaged in a long-running scheme and course of business designed to generate additional cash to fund Tricolor's operations and prop up the otherwise struggling business.

53. Among other things, Defendants sought to secure additional funding by fraudulently pledging the same auto loan receivables to multiple lending facilities and TAST ABS Offerings' collateral pools.

54. Defendants also included dead loans and fictitious loans in the TAST ABS Offering collateral pools, and manipulated loan data to conceal the dead loans and the true

performance of the underlying receivables from investors, the Indenture Trustee, and the underwriters.

55. By double-pledging the same auto loan receivables, and including ineligible collateral, dead loans, and fictitious loans in the collateral pools for multiple TAST ABS Offerings and warehouse lending facilities, Defendants greatly weakened Tricolor's collateral base. They also obligated Tricolor to pay interest and principal on the same loan multiple times, while only receiving (at most) a single payment from the borrower.

56. Furthermore, Defendants' inclusion of dead loans and fictitious loans in TAST ABS Offering collateral pools was highly problematic for investors because, contrary to the Offering Documents, these loans were not generating principal and interest payments thereby painting a false picture of the cash flows available to pay interest and principal on the securities.

57. From 2022 to 2025, rising interest rates, used car inventory costs, and general economic conditions significantly increased Tricolor's cost of capital, further constricting the company's cash flow and damaging Tricolor's overall business. These same conditions contributed to increases in subprime auto delinquencies, which shrunk Tricolor's eligible collateral pool and thus limited the amount of funds that Tricolor could draw on its warehouse loans.

58. As a result of these factors, Tricolor's auto sales and lending business became less profitable in 2022 and subsequent years, and Tricolor faced significant pressure to generate liquidity to fund its operations.

59. From at least early 2020 through August 2025, at Chu's direction, Kollar and Seibold worked together to double-pledge thousands of loans to multiple collateral pools by (1) selecting loans to be pledged to each pool or funding facility; (2) creating fictitious loans by

falsifying loan identifiers, including VINs; (3) altering delinquency status in internal spreadsheets, as well as in data, MSRs, Investor Reports, and borrowing base reports that Kollar and Seibold provided to lenders and TAST ABS Offering underwriters. Chu and Kollar signed and certified as accurate the MSRs, Investor Reports, and borrowing base reports.

60. Chu supervised and directed the fraudulent scheme and was directly involved in double-pledging and loan data manipulation in Tricolor's financials, MSRs, and borrowing base reports.

61. In furtherance of the scheme, in or around 2019, Chu instructed Kollar to set up a fictitious off-the-books entity referred to in Tricolor communications as "Company 23" (or "C23") to house dead loans and apply fake payments to make them appear current; and Kollar executed on this instruction. Defendants Chu and Kollar used Company 23 in this manner for at least several years.

62. Defendants' fraudulent manipulations included, among other things, (1) double-pledging securitized receivables back to warehouse facilities, (2) including dead loans and delinquent loans in borrowing base reports, MSRs, and Investor Reports, and (3) falsifying eligibility criteria of included loans.

63. Moreover, Defendants knowingly or recklessly aided and abetted Tricolor's securities law violations by providing substantial assistance to Tricolor's misrepresentations and the design, direction, approval, and execution of the fraudulent schemes described herein.

64. To impede analytical review by auditors, Kollar sometimes sent reports as PDFs (or instructed Seibold to send PDFs). For example, in July 2023, when one of Tricolor's auditors requested MSRs for two TAST ABS Offerings conducted in 2021 and 2022 (TAST 2021-1 and TAST 2022-1), Chu cautioned Kollar to be careful about what he shared with the auditor,

because one of Tricolor's lending facilities included loan receivables that were also pledged to TAST 2020-1 and three other warehouse facilities. Kollar stated by text that he would "send the pdf reports" which would prevent auditors from seeing the "details."

65. During the Relevant Period, Defendants emailed and texted about Tricolor's financial difficulties and the fact that ineligible loans were being included in both the warehouse lines and TAST ABS Offerings.

66. For example, in July 2021, Kollar texted Chu that an auditor should not "try to tie out [a warehouse lending facility]" that was double-pledged and included ineligible loans, Chu replied, "I know," and Kollar later described the collateral in this facility as "garbage, zombie loans which were ineligible anywhere."

67. On July 25, 2022, Chu asked Kollar if they could "work the >60s," meaning manipulate the delinquency data for loans over 60 days past due. Kollar responded that he and Seibold "can work magic," and the two proceeded to alter report fields to show those delinquent loans as current. On November 16, 2022, Kollar reported to Chu by text that manipulating delinquency data had generated an extra $1.3 million in advanced funds.

68. On July 28, 2023, in connection with a lender audit, Chu texted Kollar asking him to "reconstruct" Financial Institution D's borrowing base, which Chu knew included double-pledged loans. Chu texted "…they will definitely check for dups," meaning duplicate, or double-pledged, loans. Kollar texted back "[the borrowing base] includes loans that are not active [dead loans]. So, if they compare to the data tape and add up all the warehouse and securitizations, we will have more loan $$ than the data tape total." In other words, Tricolor had drawn down more money from the warehouse facilities than the value of the collateral pledged to those facilities—

which would be a significant red flag to Tricolor's auditors and lenders, since the advance rates on Tricolor's lending facilities were generally only 70% to 80% of pledged collateral.

69. In the same July 28, 2023 text chain, Chu then asked Kollar if they "need[ed] to remove the ineligibles from the SPVs?." In other words, Chu was asking whether they needed to remove from the data sent to the auditors any ineligible loans which had been pledged to the warehouse lending facilities.

70. In March 1, 2023 text messages to Senior Executive A, Seibold described double-pledging efforts, writing that he was "taking accounts from [a warehouse collateral pool] and pledging on [another warehouse collateral pool] to get liquidity out of [the second warehouse collateral pool]," to which Senior Executive A replied with a crying emoji. Seibold then stated that he was "possibly taking [a third warehouse collateral pool's] accounts and double-pledging on [the first warehouse collateral pool he had mentioned]."

71. On September 8, 2023, Seibold sent a Teams message to Senior Executive A stating that Tricolor was "[r]eally needing the securitization" to provide cash to address the company's liquidity needs, because nearly all the warehouse facilities were "capped out." By "capped out," Seibold meant that Tricolor had already drawn down the maximum amount allowed under the lending agreement. Seibold further explained that, "We have some room on [one of the warehouse collateral pools that was not capped out] but are trying to keep it relatively clean"—by which Seibold meant that Tricolor was trying to minimize the number of doubled-pledged loans and dead loans in that warehouse facility. But he did not believe that it would be possible to actually keep the facility "clean."

72. In the same September 8, 2023 Teams message chain, Seibold expressed concern about the coming audits—which he thought would be "tough"—and expressed his hope that, after the next TAST ABS Offering, Tricolor would be able to "keep them a bit cleaner."

73. Throughout the Relevant Period, Seibold knew that the auto loan receivables were being double pledged between these warehouse facilities and the TAST ABS Offerings, often to cover shortfalls on interest payments owed to investors, and that this data manipulation would mislead investors in the TAST ABS Offerings.

74. In a June 17, 2025 email, Kollar instructed another Tricolor employee to include the same 3,225 loans as collateral in two different TAST ABS Offerings (TAST 2022-1 and TAST 2025-2). When the employee asked, "Just to confirm you are asking to leave the 3,225 contracts in both the TAST2025-2 and TAST2022-1 reports?," Kollar replied "Yes."

75. Defendants' fraudulent conduct led to a shortfall of approximately $800 million in Tricolor's collateral base.

## V. FINANCIAL STATEMENT AND OTHER MISREPRESENTATIONS

76. During the Relevant Period, Defendants and Tricolor made numerous other misrepresentations to investors, underwriters, and warehouse lenders through Tricolor's financial statements, Offering Documents, and other communications.

77. To artificially enhance the appearance of Tricolor's financial performance, Chu and Kollar manipulated quarterly financial information, including deferring wholesale inventory losses, adjusting fair-value models to meet interest coverage ratios, and booking approximately $100 million in "bad debt" adjustments to reflect fictitious collateral in connection with a 2022

audit of Tricolor's financial statements.[4] Chu and Kollar knowingly included these manipulated metrics in Offering Documents and other materials that Tricolor provided to potential investors and lenders.

78. In addition, Offering Documents and pitch decks that Chu and Kollar approved falsely represented Tricolor's solvency, access to capital, and adherence to servicing practices.

79. Some, if not all, of the Offering Documents that Chu and Kollar approved falsely represented that loan pool collateral was unencumbered as of the relevant offering date, despite the pools including auto loan receivables already pledged to warehouse lending facilities.

80. By including encumbered collateral in TAST ABS Offering loan pools, Tricolor rendered false the Offering Documents' representations that: (1) there were no contract breaches and liens that would have a material adverse effect on the performance of Tricolor; (2) loan collateral transfers were valid; (3) there were no other liens against the collateral; (4) Tricolor held valid security interests in loan collateral; and (5) the collateral was not pledged or assigned to any other party.

81. From early 2023 to its bankruptcy in September 2025, Tricolor conducted six TAST ABS Offerings in which it misrepresented to investors that it was in compliance with its charge-off policies.

82. Tricolor's charge-off policies stated that Tricolor would charge off a receivable at 120 or more days past due or upon repossession or sale of the underlying vehicle, and that it would remit 100% of insurance and recovery proceeds to the relevant Tricolor Auto Securitization Trust.

---

[4] This bad debt adjustment was carried forward through Tricolor's subsequent financial statements in 2023-2025.

83. In practice, however, from at least early 2023 through September 2025, dead loans remained in one and sometimes multiple Tricolor securitization pools or were placed into new securitization pools at the outset of the TAST ABS Offering.

84. Defendants' misrepresentation that Tricolor had complied with its charge-off policies was material because failing to do so impacted the performance of the securities, as the included dead loans and fictitious loans were not actually receiving principal and interest payments.

85. Also at Chu's direction, Tricolor retained recoveries on charged-off loans in full or in part to offset various financial shortfalls, in violation of detailed provisions in the TAST ABS Offering Documents requiring these funds to go to the TAST ABS Offering investors. This retention, too, was material, as the practice directly affected the payments owed to investors.

86. Many investors invested in several TAST ABS Offerings. At least one repeat investor, Financial Institution F, based its investment decisions in part on its experience with the performance of the securities issued in prior TAST ABS Offerings, as reflected in the MSRs it received.

87. For Financial Institution F, double-pledging was a "bright line" for an asset-backed security, and it would not have invested in the TAST ABS Offerings if it had known about any double-pledging in any of the warehouse lending facilities or TAST ABS Offerings. Indeed, any reasonable investor in the TAST ABS Offerings would have considered the true state of the collateral pools, the existence of double-pledging, the inclusion of dead or fictitious loans, and the manipulation of Tricolor's financial metrics to be highly material—if not completely dispositive—in making an investment decision.

88. In August 2020, Senior Executive A confronted Chu about the inclusion of dead loans in TAST ABS Offering pools, and Chu admitted to Senior Executive A that Tricolor included those dead loans because it did not have enough "clean," or unpledged, collateral.

89. On May 21, 2024, Chu texted Kollar, "Is the April loss # final?," referring to the internal cash flow model shared with and reviewed by Tricolor's auditors.

90. Kollar used the "internal cash flow model" to determine how many loans Tricolor would need to misrepresent to each facility and to determine the fair value of Tricolor's portfolio.

91. Kollar responded to Chu's May 21, 2024 text that the April loss number "includes $3M of wholesale loss deferrals," meaning that Kollar had manipulated wholesale auto sale losses to decrease the amount of the total loss by $3 million, and that there was "[n]ot much else left for April." By "not much left," Kollar meant he had adjusted the wholesale loss deferrals by as much possible and that further adjustments to the model were not possible for that month.

92. Also on May 21, 2024, Kollar texted Chu to let him know that he had "edited the cash flow file to make sure 2023 ties out and rolls." Chu "liked" Kollar's message.

93. Certain of Tricolor's warehouse credit agreements required Tricolor to maintain a debt service coverage ratio of at least 1.35 to 1, calculated by dividing Tricolor's total operating income for the prior four quarters by its required principal and interest payments on its debt for the same time period.

94. In July 2024, Kollar texted Chu with details about how he was manipulating Tricolor's financial data to meet Tricolor's required debt service coverage ratios: "To make the [second quarter] covenants work we need $18.5M [from the] FV [fair value model] and $1m of deferring wholesale [inventory losses] that gets us to barely over the 1.35:1" debt service coverage ratio.

95. In October 2024, Chu texted Kollar: "How did you end up at SEPT YTD and Q3," by which Kollar understood that Chu was asking about the September year-to-date and third quarter financial performance data, and how that performance compared to the metrics required under Tricolor's various warehouse lending agreements. Kollar responded, "We needed $10m [fair value] to make covenants," thus informing Chu that Kollar had manipulated the cash flow model to increase the fair value of Tricolor's receivables by $10 million.

96. Defendants Chu and Kollar were the makers of the false and misleading statements in the Offering Documents and MSRs. As the CEO and Chairman of Tricolor and signatory for the depositor, Chu signed the Offering Documents, Form ABS-15G filings, and MSRs, and he maintained final authority over their contents. As CFO, Kollar prepared and signed MSRs, participated in drafting and reviewing Offering Documents and investor pitch decks, and maintained final authority over the financial information contained therein. Chu and Kollar also signed certifications required by the Offering Documents, attesting that representations made therein were true as of the closing.

97. Tricolor is also a maker of these same statements because the Offering Documents and MSRs were attributed to it and because the actions of Chu and Kollar, taken within the scope of their employment, are imputed to Tricolor.

## VI. MISLEADING AUDITORS AND MANIPULATION OF AUDIT DATA

98. Throughout the Relevant Period, Tricolor was required to conduct annual audits of its financial statements generally and of each of its warehouse lending facilities.

99. Audits of Tricolor's financial statements and the warehouse lending facilities were conducted by separate audit firms.

100. Tricolor's audits were relied upon by Financial Institution A, Financial Institution B, and Financial Institution C in their capacities as warehouse lenders and as underwriters, managers, bookrunners, and structuring agents for TAST ABS Offerings.

101. At various times during the Relevant Period, Kollar and Seibold both lied to auditors to cover up problems in Tricolor's loan data.

102. By concealing information from Tricolor's auditors and manipulating data provided to the auditors, Kollar and Seibold were able continue their fraudulent scheme described herein and conceal their misconduct from investors and Financial Institution A, Financial Institution B, and Financial Institution C.

103. From at least 2022 through 2025, Kollar misled auditors about Tricolor's financial performance and condition, and he taught and instructed Seibold to falsify documents, including borrowing base reports.

104. Seibold coordinated audit responses required under Tricolor's warehouse agreements.

105. Seibold manipulated data to obtain clear audits (including falsification of account ledgers and VINs), understanding that the audit reports would also be sent to lenders and investors. Each of the Defendants knew that clear audits were necessary for Tricolor to complete additional TAST ABS Offerings.

106. Near the time that Tricolor collapsed, Chu berated Seibold about delays in completing one of the Tricolor audits. Seibold responded by explaining to Chu that 100 account ledgers had to be falsified before Tricolor could complete its audit.

## VII. DEFENDANTS ATTEMPT TO CONCEAL THEIR FRAUD FROM TRICOLOR'S LENDERS AND UNDERWRITERS

107. In August 2025, an analyst at Financial Institution E, which was both a warehouse lender and an investor in several TAST ABS Offerings, detected significant discrepancies in the MSR data that Tricolor had provided for Tricolor warehouse facilities in which his firm was involved. The analyst discovered that numerous loans that Tricolor marked as current (i.e., timely receiving payment from the borrower) did not show a corresponding reduction in the outstanding principal balance for several months, as would be expected if the borrowers actually had made timely payments of principal and interest on the auto loans.

108. In August 2025, Financial Institution E reported its concerns to Financial Institution A, also a lender on the relevant warehouse lending facility. Soon after, Financial Institution A confirmed the discrepancies identified by Financial Institution E and began to conduct additional analysis of the MSRs and other loan data, which uncovered significant double-pledging between the warehouse lending facilities and the TAST ABS Offerings.

109. Financial Institution A's August 2025 analysis identified the following volume of double-pledging for loans pledged to TAST securitizations:

| | Double-pledged TAST Principal Balance |
|---|---|
| 2025-2 | $49,019,017.92 |
| 2025-1 | $59,854,214.10 |
| 2024-3 | $11,415,819.64 |
| 2024-2 | $20,217,510.61 |
| 2024-1 | $147,806,465.25 |
| 2023-1 | $62,787,694.36 |
| 2022-1 | $14,396,384.77 |
| **Total** | **$365,497,106.65** |

110. According to Financial Institution A's August 2025 analysis, the most recent securitization, TAST 2025-2, included approximately $49 million in double-pledged loans.

111. Financial Institution A also identified the 3,225 loans double-pledged from the TAST 2022-1 securitization to the TAST 2025-2 securitization—the same loans that Kollar had instructed another Tricolor employee on June 17, 2025 to list as owned by both TAST 2022-1 and 2025-2.

112. On or about August 13, 2025, Financial Institution A contacted Tricolor to discuss the audit issues and the data discrepancies that both it and Financial Institution E had identified.

113. When Tricolor learned that Financial Institution A had suspicions about data discrepancies, Tricolor's executive team conducted a series of internal calls to address the concerns. At the end of one of the early calls, Chu instructed Kollar and the other Tricolor executives to create a chat group to coordinate their response to the issues the lenders raised. Kollar suggested using WhatsApp because it was more secure and might be more easily concealed than Microsoft Teams chats, which they often used for internal Tricolor discussions. Chu agreed and suggested that they call the group chat "911." Later, when the risk of potential investigations and prosecutions became apparent, Chu, Senior Executive A, and Senior Executive B agreed to delete the encrypted WhatsApp "911" chats. Chu and the other executives also called Kollar to confirm that he deleted his 911 chats. Chu checked some of the executives' phones to confirm that they deleted the 911 chats.

114. In addition, Chu organized a series of phone calls with senior Tricolor executives in August and September 2025 to discuss how to respond to the lenders' concerns. Senior Executive B began recording these calls on August 17, 2025, shortly after Financial Institution E raised its initial concerns (the "August 2025 Calls").

115. In several August 2025 Calls recorded by Senior Executive B, Chu brainstormed various ways to conceal the fraudulent scheme, including by fabricating policies to explain delinquency data and proposing that they blame the double-pledging and data manipulations on a "system issue."

116. On a call recorded on August 17, 2025 (the "August 17 Call"), Chu spoke with Kollar and Senior Executive B about Financial Institution E's concerns regarding Tricolor's delay in completing an audit, urging the team to find a solution and observing that "rather than conform all of our records to meet the audit…we need to rethink, kind of holistically, all of the processes that are resulting in this" delay. Chu further drew an "analogy" to another time when the team managed to conceal Tricolor's earlier fraudulent use of "dead loans on the balance sheet" to borrow capital during a 2022 financial statement audit, as discussed in paragraph 77. Chu emphasized that his "point in that analogy" was that "rather than scrambling" to figure out, "okay, how are we gonna fabricate these loans? How are we gonna make up these loans? We just basically created around the problem with a structure, or I would say in this case, a policy… which made … all the math work. And so, we have a similar math problem today."

117. On the August 17 Call, Chu proposed that Defendants come up with "an arsenal of documented additional deferment[]" policies that they could use to explain why the collateral pools included loans over 60 days past due. Chu proposed as an example that they fabricate a "Trump administration deferment" policy to justify certain deferments. Chu acknowledged later in the discussion that "where we would have an issue… is if they sent an auditor and they said, pull this up on your screen, right, that would be a problem." Kollar agreed, stating, "Yes. That would be bad," as Tricolor's internal records would not match the manipulated records and false excuses Chu proposed that they provide to lenders and auditors.

118. On the August 17 Call, Chu also explored the possibility of securitizing more bad collateral in the warehouse facilities to help generate cashflow and wash out Tricolor's poor performance. He proposed securitizing the bad collateral in those facilities in a new TAST ABS Offering, stating: "It would be great to somehow without fucking ourselves on the pool performance…if we could make a bunch of…that stuff actually go away… If [Senior Executive A] is right, then you can in theory put more shit in that securitization and it will all kind of wash out…if we can get [the audit] cleaned up…we stuff as much as we can in that next securitization…That makes [Financial Institution A] happy because of the fees. That makes [Financial Institution E] happy because it reduces their exposure. And it leaves very little to audit." No such securitization ever took place.

119. On a call recorded by Senior Executive B on August 18, 2025 (the "August 18 call"), Chu, Kollar, Senior Executive A, and Senior Executive B continued to discuss how to address Financial Institution E's findings that loans that were 90 to 180 days past due were reported to TAST ABS Offering investors and lenders as current. During the call, Chu described how the Financial Institution E analyst had identified "$63 million of loans that have not had a payment in 180 days that are marked as current in the borrowing base" month-over-month. Chu asked who was preparing the reports, and Kollar said that he had created most of them and noted that Seibold had created the reports for one of the warehouse facilities.

120. On the August 18 Call, Chu expressed frustration at Kollar for not checking Seibold's work and stated he did not understand how Seibold could "be doing this and not thinking that the balance has to reduce" every month. Chu angrily ranted that "these loans are over half a year delinquent and they're marked as current and [Seibold and Kollar are] showing

the same fucking balance every period. So, we're fucked either way. As soon as we correct it, then we're overdrawn."

121. After that, Seibold was added to the August 18 call, and Chu demanded to know why Seibold had not thought to falsely reduce the balances in the borrowing base provided to lenders when Seibold fraudulently marked the loans as current. Seibold responded: "I've been holding 8,000 outstanding charge offs [or "dead loans"] on every report for…a long time." Seibold further explained on the August 18 Call that "we're bleeding them out but we're not doing it fast enough apparently." Chu reiterated, "but why would you…why wouldn't we be reducing the balance on a report? How do you keep the balance current and not show any payments applied?" Chu then addressed Kollar, "I would ask you before, Jerry, if we're reducing the balances? You said 'yes'," referring to earlier conversations between Chu and Kollar in which Chu asked Kollar whether this cover up step was being completed.

122. As the August 18, 2025 call continued, Chu again asked the group about the possibility that they could falsely claim that a system error caused the data anomalies discovered by Financial Institutions A and E. Chu had just a few minutes before he was going to speak to representatives from those financial institutions and asked for help finding an explanation—other than the truth—that they could give to the lenders that would be believed. Chu then stated, "Okay, so look I'm running out of time…I got 5 minutes. What do I throw out there as a system issue?…We have to have some sort of system issue." Kollar and Senior Executive A offered potential explanations, but Chu concluded that none of their ideas would work because they would not allow Tricolor to show payments or "explain how a system issue happened here, and it didn't happen anywhere else."

123. On August 19, 2025, on another call recorded by Senior Executive B between Chu, Senior Executive A, Kollar, and Senior Executive B, Chu described how he falsely told a representative of Financial Institution E that the cause of the fraudulent data must be a "system issue." Chu recounted he told Financial Institution E, "look, if we were trying to commit fraud, we wouldn't be so stupid as to keep the same balances on there...Nobody would be that stupid," and that the representative from Financial Institution E responded, "You're right." Kollar facetiously retorted, "except me and Ameryn [Seibold] I guess." In that call, they also discussed their hope that representatives from Financial Institution A had not noticed the fact that they had failed to reduce the balances on the dead loans.

124. Also on August 19, 2025, in an apparent attempt to create a defense, Chu began recording portions of certain calls among Tricolor executives and certain outside parties.

125. In the calls that Chu recorded, some of which included lenders and other third parties, Chu shifted his tone, feigning ignorance of the double-pledging, the inclusion of dead loans and other ineligible collateral in the warehouses and securitizations, and of other data tape manipulations.

126. When Chu started feigning ignorance, Kollar expressed to Seibold his fear that Chu was going to try to put the blame on Kollar, to which Seibold responded that that was "bullshit" because Chu was the one who gave them the idea and the instructions.

127. For example, on a Chu-recorded August 27, 2025 call with a warehouse lender, Chu pretended to be shocked by the fraudulent conduct at Tricolor: "It's really fucking unbelievable I mean it's so fucking unbelievable." Chu then told the lender a story about how he purportedly first learned about the double-pledging scheme—the scheme he in fact orchestrated—when representatives of Financial Institution A called, "and said…we want to flag

something with you. We're seeing some discrepancies in your borrowing base." Chu recounted how he asked Kollar about Financial Institution A's findings, and claimed that Kollar responded, "I occasionally have to manipulate the borrowing bases because, you know, cash flow didn't meet whatever didn't meet our outflows." Chu claimed that he asked Kollar, "how are you doing it…?" He expressed mock shock telling Financial Institution A that "in the call [Kollar] actually described all this stuff. And so, by the time I got to [Financial Institution A], I knew what had happened." This was a ruse, as Chu had directed the fraudulent scheme since at least 2020 and had proposed various ways to cover up the fraud just days earlier.

128. In late August 2025, due to the giant hole in its balance sheet created by the fraudulent double-pledging and data manipulation scheme described above, Tricolor's liabilities greatly exceeded its assets, and the company was unable to cover its ongoing operations.

129. By late August 2025, Tricolor had defaulted on its payment obligations to its lenders and was in violation of numerous covenants, which led the lenders to terminate funding and call the debt owed on Tricolor's warehouse facilities. At the time, Tricolor had approximately $800 million in outstanding loans due and owing.

130. On September 6, 2025, Tricolor placed more than 1,000 of its employees on unpaid leave of absence.

131. On September 10, 2025, unable to fund new loans or pay its employees, Tricolor filed a Chapter 7 bankruptcy petition in the Northern District of Texas (Case No. 25-33487-mvl7).

## VIII. MAGNITUDE OF THE FRAUD AND DEFENDANTS' GAINS

132. Due to Defendants' material misrepresentations and additional fraudulent conduct described above, Tricolor was able to raise more than $1.9 billion in a series of TAST ABS Offerings that otherwise would not have been possible.

133. A forensic firm retained by the Tricolor bankruptcy trustee has concluded that, due to Tricolor's double-pledging and fictitious loans, Tricolor's borrowing base was inflated by at least $675 million.

134. Separately, in August 2025, in response to pointed questions from Financial Institution A, Financial Institution E, and other warehouse lenders, Chu asked Kollar to conduct an analysis of the volume of Tricolor's dead loans and double-pledging.

135. Kollar's conclusions were similar to those reached by the forensic firm's analysis, which reflect that the manipulated borrowing base reports and MSRs for the outstanding TAST ABS Offerings represented total collateral pledged of approximately $2.2 billion, but Tricolor's internal loan and dealer management system showed that the actual amount of Tricolor's available collateral was only approximately $1.4 billion. These conclusions suggest that Tricolor overstated its pledged collateral by approximately $800 million.

136. Another third-party analysis following Tricolor's bankruptcy preliminarily identified extensive double-pledging in TAST pools. For example, of the 12,486 loans included in the TAST 2025-2 securitization, at least 6,850 were identified as double pledged to at least one additional counterparty, including the 3,225 loans—representing more than 25% of the TAST 2025-2 collateral—that were already and still pledged to TAST 2022-1. Of the 18,377 loans included in TAST 2025-1, more than 5,000 were identified as double pledged to at least one additional counterparty.

137. Tricolor's warehouse lenders also concluded that they would suffer substantial losses due to the collapse and bankruptcy of Tricolor and the double-pledging and other misconduct outlined herein. These lenders had reserved for more than $500 million in losses, in aggregate, on their loans. In public disclosures, the lenders attributed these losses to "alleged fraudulent activity" at Tricolor.

138. At the time Tricolor filed for bankruptcy, approximately $945 million in principal remained outstanding to TAST ABS pools, and the outstanding notes traded at steep discounts to par, evidencing investor harm.

139. In 2025, Seibold received a $25,000 bonus for completing a 2024 audit in which Seibold and Kollar provided false information to auditors in furtherance of the fraud.

140. Throughout the fraudulent scheme, Chu and Kollar received substantial compensation and bonuses tied to securitizations that would not have been possible without their fraudulent misrepresentations.

141. Chu's annual salary was $1 million in 2023, $1.5 million in 2024, and $2 million in 2025. He also received a $2 million bonus for 2024, two $125,000 securitization success bonuses in 2025, and a $15 million "special" bonus in 2025.

142. In 2025, Kollar received two securitization success bonuses totaling $275,000.

143. Tricolor could not have paid Chu's and Kollar's bonuses without Defendants' fraudulent conduct described above.

144. Made rich by his Tricolor compensation, Chu amassed substantial real estate holdings in Texas, California, Georgia, and Florida—including a property at The Four Seasons Residences in Miami that he purchased for approximately $18 million.

145. On July 1, 2025, Chu made a short-term loan to Tricolor in the amount of $6,500,000.

146. In August 2025, despite acknowledging to Kollar that Tricolor was insolvent at the time, Chu directed Kollar to have Tricolor repay his entire $6,500,000 loan. Chu thus received from Tricolor $250,000 on August 11, 2025; $4,250,000 on August 19, 2025; and $2,000,000 on August 20, 2025. Thereafter, on or about August 29, 2025, Chu purchased a $2.65 million-dollar property in Beverly Hills, CA.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**
**(Against Defendants Chu and Kollar)**

147. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 146.

148. Defendants Chu and Kollar, directly or indirectly, singly or in concert, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or the mails: (1) knowingly or recklessly have employed one or more devices, schemes, or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

149. By reason of the foregoing, Defendants Chu and Kollar, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Securities Act Sections 17(a)(1) and 17(a)(3)**
**(Against Defendant Seibold)**

150. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 146.

151. Defendant Seibold, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes, or artifices to defraud, and/or (2) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

152. By reason of the foregoing, Defendant Seibold, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

**THIRD CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Against Defendants Chu and Kollar)**

153. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 146.

154. Defendants Chu and Kollar, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce, the mails, or the facilities of national securities exchanges, knowingly or recklessly have: (a) employed one or more devices, schemes, or artifices to defraud; (b) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; and/or (c) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

155. By reason of the foregoing, Defendants Chu and Kollar, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**FOURTH CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder**
**(Against Defendant Seibold)**

156. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 146.

157. Defendant Seibold, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce, the mails, or the facilities of national securities exchanges, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud and/or (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

158. By reason of the foregoing, Defendant Seibold, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

**FIFTH CLAIM FOR RELIEF**
**Control Person Liability Under Exchange Act Section 20(a)**
**(Against Defendant Chu)**

159. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 146.

160. As alleged above, Tricolor violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

161. At all relevant times, Chu controlled Tricolor and was a culpable participant in Tricolor's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

162. By reason of the foregoing, Defendant Chu is liable as a controlling person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for Tricolor's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SIXTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Securities Act Section 17(a)**
**(Against Defendants Chu, Kollar, and Seibold)**

163. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 146.

164. As alleged above, Tricolor violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

165. Defendants knowingly or recklessly provided substantial assistance to Tricolor with respect to its violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

166. By reason of the foregoing, Defendants are liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Tricolor's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)], and, unless enjoined, Defendants will again aid and abet these violations.

**SEVENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Section 10(b)**
**and Rule 10b-5 Thereunder**
**(Against Defendants Chu, Kollar, and Seibold)**

167. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 146.

168. As alleged above, Tricolor violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

169. Defendants knowingly or recklessly provided substantial assistance to Tricolor with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

170. By reason of the foregoing, Defendants are liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Tricolor's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and, unless enjoined, Defendants will again aid and abet these violations.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Chu and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Permanently enjoining Kollar and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**III.**

Permanently enjoining Seibold and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)];

**IV.**

Ordering Defendants to disgorge ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**V.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**VI.**

Permanently prohibiting Defendants Chu and Kollar from serving as officers or directors of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. §

78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

**VII.**

Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
August 18, 2026

*/s/ Abigail Rosen*
Abigail Rosen
Eric Werner*
Armita Cohen*
Dwight Keltner*
George Carotenuto
Zachary Sturges
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
OFFICE: +1 212-336-0473
RosenAb@sec.gov
Attorneys for Plaintiff
*Not admitted in the U.S. District Court for the S.D.N.Y.